IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

SHELBY COUNTY HEALTH CARE
CORPORATION d/b/a REGIONAL
MEDICAL CENTER,

    Plaintiff,

v.  No. 05-2135 B

LARRY E. YANDELL, PAM YANDELL, and
L.A. DARLING COMPANY,

    Defendants
_____

ORDER GRANTING DEFENDANT DARLING'S MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD
_____

Plaintiff, Shelby County Health Care Corporation, d/b/a Regional Medical Center ("the Med") brought this action against Defendants, Larry E. Yandell, Pam Yandell and L.A. Darling Company ("Darling" or the "Plan Administrator"), pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), to recover amounts billed to the Yandells for medical services provided by it to Larry Yandell. Before the Court is the motion of Defendant Darling for judgment on the administrative record or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The following facts are taken from the administrative record. See Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir.1996) (noting that a court conducting a review of an ERISA benefits denial is "required to consider only the facts known to the plan administrator at the time he made his decision."). Immediately prior to February 13, 2004, Defendant Pam Yandell

was an employee of Defendant Darling and participated in the company's self-funded Corning Hourly Employee Health Care Plan (the "Plan"). (Aff. Pamela Rush Henderson ("Henderson Aff.") ¶ 2.) In 2004, Defendant Darling was the administrator of the Plan. (Henderson Aff. ¶ 4.) As Pam Yandell's husband, Larry Yandell was a beneficiary of the Plan. (Pl.'s Mem. Supp. Resp. Def. Darling Mot. Judgment Admin. Record Summ. J. ("Pl.'s Resp.") at 2; Henderson Aff., Ex. 1 at 3.)

The Plan Document and Summary Plan Description for L.A. Darling Company Corning Hourly Employee Health Care Plan ("SPD") described the Plan. (Henderson Aff. ¶ 3.) According to the SPD, coverage under the Plan terminated on the day on which a covered employee ceased to be in an "Eligible Class[]" of employees, defined as "[a]ll Active Employees of the Employer."[1] (Henderson Aff., Ex. 1 at 9, 3.) The SPD further explains that an "Active Employee of the Employer" is "an employee who is on the regular payroll of the Employer and who has begun to perform the duties of his or her job with the Employer on a full-time basis. (Henderson Aff., Ex. 1 at p. 34.) If full-time work ceases due to disability, the SPD provides that coverage may be continued for a period of six-months after the person ceased to be an Active Employee. (Henderson Aff., Ex. 1 at 9.) However, in order to continue coverage under the Plan, disabled employees

> must make monthly contributions on behalf of themselves and their Dependents. They may do so for a period of six months after the date the disability begins. Employees are entitled to 12 additional months of coverage for the disabling condition only, by making monthly contributions following the first six months of disability.

(Henderson Aff., Ex. 1 at p. 9.) The SPD further reflects that the Plan confers the "maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make

---

[1] Under the Plan, coverage for a dependant spouse, such as Larry Yandell, ceased on the "date that the Employee's coverage under the Plan terminate[d] for any reason." (Henderson Aff., Ex. 1 at 10.)

2

determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan" on the Plan Administrator. (Henderson Aff., Ex. 1 at p. 69.)

Pam Yandell went on disability leave on February 13, 2004 and remained off work through July 22, 2004. (Henderson Aff. ¶ 5.) Alice Dorobiala, a COBRA team leader for North American, the Claims Administrator for the Plan, was advised by Darling on March 10, 2004 to begin collecting contributions in the amount of $12.88 per week, as of February 15, 2004, from Pam Yandell in order for her to maintain coverage under the Plan during her period of disability. (Aff. Alice Dorobiala ("Dorobiala Aff.") ¶ 3.) In a letter dated March 16, 2004, Dorobiala informed Pam Yandell of her obligation to make monthly contributions by the first Friday of each month in order to prevent termination of her coverage. (Dorobiala Aff., Ex. 2.) The letter also advised Ms. Yandell that, if contributions were made, her coverage could continue in this manner until August 13, 2004. (Dorobiala Aff., Ex. 2.) As of that date, she would be eligible to continue coverage for herself only for an additional twelve months or to elect full coverage for herself and her husband, Larry Yandell, under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). (Dorobiala Aff., Ex. 2; Henderson Aff., Ex. 1 at 63-68.) On June 9, 2004, North American sent a second letter to Yandell notifying her that the rates for her continued coverage had changed. (Dorobiala Aff., Ex. 4.) In addition, the letter informed her of a $244.28 balance due for coverage during the period of February 13, 2004 to June 30, 2004 and noted that, in the absence of receipt of her payment by June 23, 2004, her coverage would be terminated.[2] (Dorobiala Aff., Ex. 4.)

It is undisputed that Pam Yandell did not make any personal contributions to the Plan during

---

[2] Specifically, the letter stated "At the present time, you have a balance due of $244.28, for the period of 2/13/04-6/30/04, which is due no later than 6/23/04, or your coverage will be terminated." (Dorobiala Aff., Ex. 4.)

3

the period she was on disability leave. (Dorobiala Aff. ¶ 9, Ex. 5; Henderson Aff. ¶ 8.) It is the Defendant's position that, because of her nonpayment, her coverage, and thus that for Larry Yandell as a beneficiary, was terminated.[3] (Dorobiala Aff. ¶ 10.) Under the terms of the SPD, the effective date of the termination was the day on which Pam Yandell ceased to be an Active Employee, or February 13, 2004. (Henderson Aff., Ex. 1 at 9, 3.) When she returned to work from her disability leave on July 22, 2004, North American began her coverage anew. (Dorobiala Aff. ¶ 10, Ex. 6.)

On March 20, 2004, during the period in which Ms. Yandell was absent from work on disability leave, Larry Yandell was admitted to the Med for treatment of injuries he had sustained. (Compl. ¶ 4-5.) North American verified his coverage and provided the Med with a precertification reference number on March 22, 2004. (Pl.'s Resp., Ex. E.) Larry Yandell remained in the Med where he received medical services until April 26, 2004. (Compl. ¶ 4-5.) During this period, he incurred $234,657.07 in medical expenses. (Compl. Ex. A, Aff. Mike Phillips ("Phillips Aff.") at 1.) The Med submitted a claim for those charges, which was subsequently denied.[4] (Henderson Aff. ¶ 10.) While the Plan provided procedures for participants to seek review of benefit denials,[5] neither

---

[3] It is unclear from the evidence submitted on what date the decision was made to terminate Pam Yandell's coverage. However, in an email dated July 26, 2004, Dorobiala informed Darling that Yandell's coverage was terminated effective February 13, 2004 but was later reinstated upon her return to work in July, 2004. (Dorobiala Aff., Ex. 6.)

[4] The Explanation of Benefits denying payment of the claim states as the basis "Reason Code R3," or "subject to pre-existing condition review." (Def.'s Mem. Law Supp. Mot. Judgment Admin. Record Summ. J. ("Def.'s Mot."), Ex. 3.) The parties dispute whether this was, in effect, a denial, but agree that Darling did not pay the claim. (Pl.'s Resp. at 6.)

[5] Specifically, the SPD stated that

[w]hen a claimant receives an adverse benefit determination, the claimant has 180 days following receipt of the notification in which to appeal the decision. A claimant may submit written comments, documents, records, and other information relating to the Claim. If the claimant so requests, he or she will be provided, free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the

4

the Yandells nor the Med filed any such appeal. (Henderson Aff. ¶ 11.)

In the instant action, the Plaintiff seeks to recover benefits alleged to be wrongfully denied to the Yandells pursuant to 29 U.S.C. § 1132(a)(1)(B) ("Section 502").[6] (Def.'s Mot. at 6, n. 5; Pl.'s Resp. at 4.) Section 502 provides a plan participant a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A denial of benefits under Section 502 is to be reviewed under a de novo standard, unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Williams v. Int'l Paper Co., 227 F.3d 706, 710-11 (6th Cir.2000) (citations omitted). Where an ERISA plan expressly affords discretion to a plan trustee to make benefit determinations, a court reviewing the plan administrator's actions applies an arbitrary and capricious standard of review. Id. Here, the Med argues that because Darling contended that it had "no choice" but to terminate the Yandell's coverage under the Plan, the decision to deny the Med's claim should be reviewed de novo. However, despite the Defendant's choice of words, the Plan explicitly gives discretion to the administrator to "construe and interpret the terms and provisions of the Plan, to

> claim.
>
> . . .
>
> The review shall take into account all comments, documents, records, and other information submitted by the claimant relating to the Claim, without regard to whether such information was submitted or considered in the initial benefit determination. The review will not afford deference to the initial adverse benefit determination and will be conducted by a fiduciary of the Plan who is neither the individual who made the adverse determination nor a subordinate of that individual. The appeal should be forwarded to the Plan Administrator at the address listed in the General Plan Information section.

(Henderson Aff., Ex. 1 at 54-56.)

[6] The Med asserts its claim against Darling as an assignee of the Yandells. (Compl. ¶¶ 7-8, Ex. B.)

make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan." (Henderson Aff., Ex. 1 at 69.)  "When interpreting ERISA plan provisions, general principles of contract law dictate that we interpret the provisions according to their plain meaning in an ordinary and popular sense." Williams, 227 F.3d at 711.  Considering the policy language according to its "plain meaning," it is clear that the Plan gives the administrator discretion and authority to make eligibility determinations.  Accordingly, the Court must apply an arbitrary and capricious standard.  See e.g. Dowden v. Blue Cross & Blue Shield of Texas, Inc., 126 F.3d 641, 644 (5th Cir. 1997) (applying arbitrary and capricious standard where plan provided "full and complete authority and discretion to the [administrator] to make decisions regarding eligibility and benefits.").

     The arbitrary or capricious standard is a "highly deferential" standard of review.  Yeager, 88 F.3d at 380. When reviewing a decision under this standard, a court must decide whether the plan administrator's determination was rational in light of the plan's provisions. Williams, 227 F.3d at 712. "Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Id. (quoting Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir.1989));  Raskin v. UNUM Provident Corp., No. 03-2270, 2005 WL 271939, at *2, 121 Fed. Appx. 96, 99 (6th Cir. Feb.3, 2005). The fact that a contrary conclusion could have been reached does not afford a basis to override the committee's decision. Whitehead v. Federal Express Corp., 878 F. Supp. 1066, 1070 (W.D. Tenn.1994). Under this standard, the insured or her assignee bears the burden of proof. Dowden, 126 F.3d at 644;  Bowen v. Central States, Southeast and Southwest Areas Health and

Welfare Fund, No. 91-3981, 1992 WL 92832, at *3 (6th Cir. May 6, 1992) (holding that the benefit determination must be sustained unless plaintiff can prove that the actions were arbitrary or capricious).

In the instant motion, the Defendant maintains that, because Pam Yandell did not make the required contributions during her disability leave, it was within its rights under the Plan to terminate her coverage effective February 13, 2004 and thus, was not liable for medical expenses her dependant, Larry Yandell, incurred after that date. (Def.'s Mot. at 6-10.)  In response, the Plaintiff maintains that, in order to terminate Ms. Yandell's coverage, there must first have been a "Qualifying Event" pursuant to 29 U.S.C. § 1163.[7] (Pl.'s Resp. at 4-5.)  Pam Yandell was on worker's compensation leave from February 13, 2004 until July 22, 2004 for job-related injuries. Because such leave is not a Qualifying Event under § 1163, Plaintiff maintains that Darling had no right to terminate coverage. (Pl.'s Resp. at 4-5.)

The Court finds Plaintiff's argument to be without merit. 29 U.S.C. § 1161, another provision of COBRA, requires that

---

[7] 29 U.S.C. § 1163, a provision of COBRA, provides that

[f]or purposes of this part, the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary: (1) The death of the covered employee; (2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment; (3) The divorce or legal separation of the covered employee from the employee's spouse; (4) The covered employee becoming entitled to benefits under title XVIII of the Social Security Act [42 U.S.C.A. § 1395 et seq.]; (5) A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan; (6) A proceeding in a case under Title 11, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

29 U.S.C. § 1163.

7

> [t]he plan sponsor of each group health plan shall provide . . . that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

29 U.S.C. § 1161. Section 1163, to which Plaintiff cites, defines those circumstances, or "Qualifying Events," under which a group health plan is required to allow a participant to continue coverage. However, there is no issue in this case as to whether Darling provided Pam Yandell with the opportunity to continue her coverage. As noted above, North American notified Yandell of her option to continue coverage for herself and her husband for six-months, or until August 13, 2004. (Dorobiala Aff., Ex. 2.) She was further informed that, after August 13, 2004, she would be eligible to extend coverage for herself only for an additional twelve months or, pursuant to COBRA, to elect full coverage for herself and her spouse. (Dorobiala Aff., Ex. 2; Henderson Aff., Ex. 1 at 63-68.) The initial period of continued coverage at issue in the instant action was not offered to Pam Yandell pursuant to COBRA, but under the terms of the Plan.[8] Because the plain language of the Plan specifically required that Ms. Yandell make contributions in order to maintain her coverage and because those payments were not made, the Court cannot conclude that Darling acted in an arbitrary or capricious manner in terminating her coverage as of the date that she ceased to be eligible for coverage.

Plaintiff also argues that "it was the intention of [Darling] not to terminate the coverage on Pam Yandell" and further, that such coverage was not actually terminated during the time Larry Yandell incurred the medical expenses at issue in this action. (Pl.'s Resp. at 9.) In support, the Med

---

[8] Even if the coverage in question was pursuant to COBRA, the law does not require that such coverage be provided without cost. Rather, "COBRA specifically authorizes plan administrators to charge a premium for the continuation coverage." See Fallo v. Piccadilly Cafeterias, Inc., 141 F.3d 580, 585 (5th Cir. 1998) (citing 29 U.S.C. § 1162 (3)).

8

offers an email communication, dated March 12, 2004, in which Brenda Cross[9] of Darling responded to an email from Dorobiala in which Dorobiala sought confirmation that Pam Yandell should have been terminated on February 24, 2004. (Dorobiala Aff., Ex. 1.) In that email, Cross stated that she did not know why Pam Yandell was terminated "as she is on leave of absence, not termed." (Dorobiala Aff., Ex. 1.) In addition, Plaintiff cites a handwritten note by Dorobiala on a print-out of the same email communication in which Dorobiala noted "[p]er Brenda Cross, do not term Pamela, they will collect her premiums at their end." (Dorobiala Aff., Ex. 1.) The Med also cites in support of coverage the precertification authorization provided by North American on March 22, 2004, as well as evidence that the Plan paid approximately forty-five (45) claims for services for Larry Yandell during the period in which Darling claims that coverage was terminated. (Pl.'s Resp., Ex. E; Pl.'s Resp. at 2-3, Ex. C.)

Whether or not Darling intended to terminate Pam Yandell, or whether it paid claims which it had no obligation to pay, is not dispositive of the instant matter. As noted above the Plan provided for termination of a participant, as of the date that they became ineligible under the terms of the Plan. Pam Yandell became ineligible on the date that she ceased to be an Active Employee, that is, February 13, 2004. Pursuant to the terms of the Plan, she had the opportunity to continue her coverage by paying monthly contributions. However, she did not make those payments and, consistent with the Plan provisions, was terminated. Likewise, the oral precertification of coverage by North American did not alter the terms of the express provisions of the Plan. See e.g. Cedars Sinai Medical Center v. Mid-West Nat. Life Ins. Co., 118 F. Supp. 2d 1002, 1008 (C.D. Cal. 2000) (holding that a binding oral contract was not formed between provider and insurer during telephone

---

[9] The parties submissions do not identify Cross' position with Darling.

conversation in which precertification was obtained.); <u>Decatur Memorial Hosp. v. Connecticut General Life Ins. Co.</u>, 990 F.2d 925, 926-27 (7th Cir. 1993) (listing cases and stating that "[a]rguments that negligent misrepresentations [in precertifications] 'estop' sponsors or administrators from enforcing the plans' written terms have been singularly unsuccessful."). Further, in regard to the representation of coverage by North American's agent as well as Darling's payment of some medical claims during the period of non-coverage, the SPD expressly provides that "[a]ny clerical error by the Plan Administrator or an agent of the Plan Administrator in keeping pertinent records or a delay in making any changes will not . . . continue coverage validly terminated." (Henderson Aff., Ex. 1 at 9.)  The fact that Plaintiff and others may have benefitted from Darling's error in paying some claims which it was not required to pay does not alter the terms under which it had a right to end Pam Yandell's coverage.  Because it's decision to terminate was not arbitrary or capricious, Darling's motion for judgment on the administrative record is GRANTED and Darling is DISMISSED from the instant action.[10]

IT IS SO ORDERED this 20th day of July, 2006.

                                                s/ J. DANIEL BREEN
                                                UNITED STATES DISTRICT JUDGE

---

[10] The Court notes that the Defendant also maintains that summary judgment is appropriate because the Plaintiff has failed to exhaust administrative remedies.  Because the Court has concluded that summary judgment is proper on other grounds, the Defendant's alternative argument need not be addressed herein.